# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **ALEXANDRA GRAFF, et al.,** | : | **Case No. 1:20cv449** |
| | : | |
| **Plaintiffs,** | : | **Judge Matthew W. McFarland** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF CINCINNATI,** | : | |
| | : | |
| **Defendant.** | : | |

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

---

## SUMMARY

This Court should deny Defendant City of Cincinnati's Motion for Judgment on the Pleadings. The City's curfew orders violate the First Amendment as they are not content neutral nor are they narrowly tailored to a compelling government interest. *See Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015). Moreover, even if they are content neutral, the curfews are not valid time, place, and manner restriction because they burden substantial amounts of protected speech, leaving no viable alternative for demonstrations. *See Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

The curfews also violate the Fourteenth Amendment because they are void for vagueness and are discriminatory in both purpose and effect. *See City of Cincinnati v. Mose Poellnitz*, Hamilton County Municipal Court Case No. 20CRB10756 (November 9, 2020 Order Granting Defendant's Motion to Dismiss); *Grayned v. Rockford*, 408 U.S. 104, 108-9 (1972); *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). Plaintiffs have standing because they have a close relationship with the protestors, and potential criminal prosecution was a hindrance to their ability to protect their interest. *See Kowalski v. Tesmer*, 543 U.S. 125, 129-130 (2004).

The curfews also violate the separation of powers doctrine because council did not authorize the emergency declaration by a two-thirds vote, and the delegation of any related powers pursuant the Cincinnati Administrative Code are unconstitutional. *See* Cincinnati Charter, Article II, Section 3. Moreover, to the extent the curfews were intended to address the covid-19 pandemic, they were preempted by state law. *See Canton v. State*, 2002-Ohio-2005, at ¶ 36-37, Amended Ohio Health Director's Stay at Home Order (Apr. 2, 2020). [1]

---

[1] This Memorandum addresses all Plaintiffs' claims except for Claim 5 for Violations of Ohio's Open Meetings Act, which Plaintiffs are considering dismissing without prejudice.

## TABLE OF CONTENTS

Summary .................................................................................................................... i

Table of Contents ...................................................................................................... ii

Memorandum .............................................................................................................1

   I.   Facts ...............................................................................................................1

       A.  The First "Emergency Order" ...............................................................1

       B.  The Second "Emergency Order" ...........................................................2

       C.  The Third "Emergency Order" ..............................................................2

       D.  The Hamilton County Municipal Court Declares the Curfews
           Unconstitutional ...................................................................................3

   II.  The Curfew Orders Are Impermissibly Vague In Violation Of The First And
      Fourteenth Amendments ................................................................................3

   III.  The Curfew Violates the First Amendment Right of Free Speech. ...........................4

       A.  Peaceful protests are constitutionally protected ..................................4

       B.  The curfew is not a content neutral time, place, and manner restriction .......7

          i.   Curfew is not content neutral ...............................................7

             1.  The media exception ..............................................7
             2.  The purpose to silence expression .................................8
          ii.  The City has not identified a compelling interest ..................10

          iii.  The Curfew is not narrowly tailored ..................................10
          iv.  The Curfew is underinclusive ...........................................12
       C.  The Curfew is not a valid time, place, and manner restriction because it
          burdens substantial amounts of protected speech leaving no viable
          alternative for demonstrations ............................................................12

   IV.  The Curfew Violates the Fourteenth Amendment's Prohibition on Selective
      Enforcement ................................................................................................13

       A.  The Curfew violates the Equal Protection Clause because it unfairly and
          disproportionately affects African-American people, communities, and
          supporters ..........................................................................................13

       B.  Plaintiffs have standing to assert their selective enforcement claims ...........17

   V.  The Curfew violates the Doctrine of Separation of Powers .............................18

       A.  The declaration of an emergency requires affirmative action by Council ....18

       B.  The COVID Declaration was not approved by Council ...............................20

       C.  Council did not give its consent to the Curfew Orders .............................20
       D.  The Mayor's emergency powers, if properly invoked, are not limitless and
          must be exercised as provided within an emergency declaration ................21
       E.  The purpose of the Curfew is unrelated to the stated purpose for the COVID
          Declaration ........................................................................................21

**F. Council's attempt to delegate powers and duties specifically vested in the legislature by the Charter is invalid**..................................................................**23**

**VI.** **The Curfew is preempted by state law** ...........................................................**24**

**VII.** **Conclusion** ..................................................................................................................**25**

**Certificate of Service**........................................................................................................................**25**

<u>**MEMORANDUM IN OPPOSITION**</u>

**I.    Facts**

On Memorial Day, 2020, Minneapolis police were recorded killing George Floyd. Several months earlier, Louisville police shot and killed Breonna Taylor in her bed as she slept. Around the same time, video emerged of the point-blank shooting of Ahmaud Arbery, who was shot by three white men not then charged with a crime despite video evidence of the killing. These three killings exacerbated, reignited, and spread collective outrage at racism—and specifically racist policing and brutality. In the wake of Floyd's death, people across the country and around the world began demonstrating to demand justice and change.  Demonstrations began in Cincinnati on Friday, May 29, 2020. Through the day and into the night, people gathered at government buildings, in parks, and on the streets and sidewalks chanting, singing, carrying signs, and collectively mourning. Later that night, Cincinnati police arrested numerous people.

**A.  The First "Emergency Order"**

The next day, on May 30, 2020, Cincinnati Mayor John Cranley released an "Emergency Order." In his order, the Mayor claimed there was an "emergency declaration currently existing in the City of Cincinnati, which declaration pursuant to Article III of the City Charter was approved by the City Council…"  The Emergency Order did not annex a copy of the purported emergency declaration, nor did it cite any ordinance or other evidence of approval by Council. According to the published Council minutes, its most recent meeting had been on May 28, 2020; the minutes contain no indication of any declaration of emergency on account of demonstrations.

The Emergency Order "implement[ed] a curfew from 10 p.m. to 6 a.m. in designated neighborhoods of the City of Cincinnati."  The Emergency Order further provided that:

> Individuals are prohibited from appearing in the public spaces of the City of Cincinnati neighborhoods of Over-the-Rhine, the Central Business

District/Downton, the Banks, and the West End during the period of the curfew. This Order is inapplicable to the City of Cincinnati officials, members of the public safety forces, emergency personnel, health care professionals, essential workers, people experiencing homelessness and local government officials engaged in their lawful duties.

Demonstrations resumed on May 30, 2020. Despite the peaceful and nonviolent nature of the protestors, Cincinnati police deployed tear gas, pepper spray, pepper pellets, flashbang grenades, and other projectiles, at times against or in the vicinity of disabled persons, children, passersby, and others. Police began physically arresting people shortly after 10:00 p.m.

### B. The Second "Emergency Order"

After numerous arrests on May 30, the Mayor issued a second "Emergency Order" on May 31. *See* Complaint Ex. A ("Second Emergency Order). The Second Emergency Order used similar language, but modified the original Emergency Order in important respects. First, the Second Emergency Order extended the hours of the curfew, imposing the restriction from 9:00 pm through 6:00 am. The Second Emergency Order also extended the geographic area of the curfew to the entire city, whereas the original Emergency Order had been limited to four neighborhoods. Lawful demonstrations again convened on May 31. Police continued to deploy tear gas, pepper spray, pepper pellets, flashbang grenades, and projectiles against demonstrators. Outside the Hamilton County Courthouse, later arrested hundreds of people for alleged curfew violations.

### C. The Third "Emergency Order"

Despite rampant police violence and hundreds of arrests, the lawful demonstrations continued. As the days passed, the number of arrests tapered. On June 3, 2020, the Mayor issued yet another order extending the curfew ("Third Emergency Order"). In the Third Emergency Order, the Mayor continued to impose a citywide curfew of 11pm to 6am through June 8.

**D. The Hamilton County Municipal Court Declares the Curfews Unconstitutional.**

On November 9, 2020, the Hamilton County Municipal Court held the curfew unconstitutionally vague and the complaints insufficient. *See City of Cincinnati v. Poellnitz*, Hamilton County Municipal Court Case No. 20CRB10756 (Order Granting Defendant's Motion to Dismiss). Other municipal court judges later joined in the decision to declare the curfews unconstitutional. To date, over one hundred cases against protestors have been dismissed.

**II. The Curfew Orders Are Impermissibly Vague In Violation Of The First And Fourteenth Amendments.**

As the Hamilton County Municipal Court has held, the curfew is unconstitutionally vague because it imposes strict criminal liability without defining the conduct that constitutes a violation, fails to define the physical areas where the curfew is in effect, and fails to specify the persons to whom the curfew applies. As a result, police enforcing the curfews were vested with and exercised unbridled discretion in determining whom to arrest – and therefore to silence. The imprecise language of the curfew orders leaves people like Plaintiffs to guess whether they will become subject to a penalty by their mere presence within the City.

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that [a person] is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [they] may act accordingly. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'

*City of Akron v. Rowland*, 67 Ohio St. 3d 374, 381 (Ohio 1993) (citing *Grayned v. Rockford*, 408 U.S. 104, 108-9 (1972)).

The curfew contains no definitions, nor any reference to any source of definitions. The curfew provides no guidance whatsoever as to the meaning of the critical terms "appearing in,"

"public spaces," "health care professionals," "essential workers," "people experiencing homelessness," or any other terms. The absence of such definitions deprives even the most well-meaning individual of any ability to assess the scope of the curfew and how to comply.

What is more, the curfew is fatally ambiguous as to whether or how it may be enforced. In its first paragraph, the curfew states that "[t]hese conditions…***may*** require enhanced enforcement authority and security resources to protect the lives and property of those who live, work, and do business in Cincinnati." From this provision, a citizen could reasonably conclude that police are not empowered to enforce the curfew absent further notice of "enhanced enforcement." Similarly, a police officer may fairly think that he may or may not enforce the curfew in his discretion.

State and federal courts have long histories of striking down vague criminal enactments, particularly where they restrict First Amendment activities.  For example, the Supreme Court invalidated Cincinnati's loitering ordinance in *Coates v. Cincinnati*, 402 U.S. 611, 615 (1971):

> [T]he vice of the ordinance lies not alone in its violation of the due process standard of vagueness. The ordinance also violates the constitutional right of free assembly and association. Our decisions establish that mere public intolerance or animosity cannot be the basis for abridgment of these constitutional freedoms.

*See also City of Akron*, 67 Ohio St.3d at 384 (noting that discretionary and vague criminal statutes are disproportionately enforced against "racial and ethnic minorities.")

As the Hamilton County Municipal Court determined, the lack of definitions and clear language in the curfew renders it void for vagueness.  The Court should deny the City's motion on this basis.

**III.    The Curfew Violates the First Amendment Right of Free Speech**

**A.  Peaceful protests are constitutionally protected**

Among the rights protected by the First Amendment from overbroad governmental regulation is the right of association for the purpose of engaging in political activity. *See, e.g.,*

4

*Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294 (1981). Indeed, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). In this regard, the rights of free speech and association are inextricably linked; the individual right to speak on political topics is strengthened when a group speaks collectively for a common purpose. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

The right to assemble peaceably is "among the most precious" rights protected in the Constitution. *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967). Indeed, "the very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably ... and to petition for a redress of grievances." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). Assembly enjoys strong constitutional protections due to its close relation to the broad right of free speech. *See NAACP*, 357 U.S. at 460. Naturally, the right to assemble includes not only the right to verbally express grievances, but also to protest peacefully in public places. *Brown v. Louisiana*, 383 U.S. 131, 141-2 (1966).

When the speech itself is political in nature, these rights are protected even further. Embedded in the First Amendment's guarantee of free expression is the notion that core political speech is deserving of the utmost protection, particularly when the content of the speech is controversial or unpopular. *See, e.g., Texas v. Johnson*, 491 U.S. 397, 414 (1989). In fact, "a principal 'function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" *Id*. at 408-9 (citing *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)). This core function of the First Amendment mandates that the potentially offensive and unpopular expression is most deserving of constitutional protection.

In addition, heightened protection applies to speech offered in traditional public forums like streets and sidewalks. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983). Quintessential public forums include streets and parks, both of which are places traditionally open to assembly and debate. *Id*.

The government has limited power to halt an immediate danger. *Cox v. Louisiana*, 379 U.S. 536, 554-5 (1965). But the mere fact that some members of a group engaged in some unprotected conduct does not justify the government's interference with the rights of the entire group. *See NAACP*, 458 U.S. at 908. Any restriction on the right to assemble in a public forum, like sidewalks or parks, must be content-neutral and reasonably related to the time, place and manner of the assembly. *See, e.g., Clark*, 468 U.S. at 293. The government must narrowly tailor its actions to a significant interest. *See Ward*, 491 U.S. at 799. It may not simply abridge free assembly because of its animosity to the assembly's message. *See Coates*, 402 U.S. at 615.

Any law that restricts the freedom of assembly must pass this standard – including a curfew. "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned*, 408 U.S. at 117. Thus, if the curfew restricts one's freedom of assembly beyond that which is incompatible to expected activity in a public forum, it surpasses the limits the government can place. Thus, a curfew receives a "particularly high degree of scrutiny" when it restricts the right to peaceably assemble. *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984); *see also, e.g., Cox*, 379 U.S. at 550 (overturning protestors' convictions for breach of the peace because peaceful protesting was protected under the freedom to assemble); *Edwards v. South Carolina*, 372 U.S. 229 (1963). Given this backdrop, peaceful protesting is cloaked with the full protection of the First Amendment.

**B. The curfew is not a content neutral time, place, and manner restriction**

The City argues that the curfew is a constitutional restriction on the time, place, and manner of speech. This position is untenable because the curfew is not content neutral, nor are its restrictions narrowly tailored to promote a substantial government interest.

**1. The Curfew is not content neutral**

A government may impose time, place and manner restrictions upon speech ("TPM"), and these are subject to a less rigorous constitutional standard. However, to enjoy the relaxed standard, the restriction must be "content neutral." *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295 (1984). That is, it may not discriminate between speakers or viewpoints.

**a. The media exception**

On its face, the curfew allowed some parties to engage in protected speech, while preventing others from doing so. For example, news media and journalists were exempted from arrest under the curfew as a matter of policy. When a Cincinnati Enquirer reporter was arrested after curfew on June 1, 2020, he was later released without charges. Both the Mayor and the Police Department publicly apologized for the arrest, and the Police Chief made a public affirmation of "the right of the press to cover our police." Yet other people who live- streamed the protests at the same time in the same place were arrested for doing so. Thus, the City allowed the "the press" to engage in speech while repressing others. This is the very definition of a content-based restriction. Members of corporate or conventional media enjoy no greater right to gather and share information under the First Amendment than any other citizen. *See Branzburg v. Hayes*, 408 U.S. 665, 684 (1972); *Houchins v. KQED, Inc.*, 438 U.S. 1, 15-16 (1978). Thus, tolerance of mainstream media expression amid repression of citizen protest is clearly viewpoint-based and not content neutral.

Content-based restrictions on speech are presumptively unconstitutional, a point the Supreme Court recently reaffirmed in *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015). Under *Reed*, a law will be declared content-based if it adopts categories or exclusions defined in terms of what is said. *Reed*, 135 S.Ct. at 2227. In addition, laws which are content-neutral on their face will be treated as content-based if their justification relies on distinctions between the message or the messenger. *Reed*, 135 S.Ct. at 2227.

The curfew restricts speech on the basis of its content. Left unregulated – and expressly exempted from the curfew – is speech by the media. The exclusion of categories of speakers in *Reed* was precisely what rendered the ordinance unconstitutional. So too here does the favorable treatment for "news" require a consideration of content and speaker before determining whether the speech is allowed. Content favoring legislation like this is presumptively unconstitutional.

### b. The purpose to silence expression

For more than fifty years, cities and states across America have attempted to criminalize speech by and in support of black liberation. Like no other political movement, the fight for racial equality has led to disproportionate arrests, police-initiated violence[2], and widespread attempts to silence protests and mass gatherings. This is why so many seminal cases addressing the right to protest and to be critical of the government arise out of the civil rights movement: *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969), which declared unconstitutional an ordinance requiring a permit to conduct a parade after Shuttlesworth was arrested for leading a peaceful march; *NAACP v. Button*, 371 U.S. 415 (1963), which struck down a statute prohibiting the NAACP from political advocacy; and *NY Times v. Sullivan*, 376 U.S. 254 (1964), which found a newspaper ad denouncing racist policing practices to be protected from civil liability. One case in

---

[2] *Cox*, 379 U.S. at 544, 547 (describing use of tear gas to break up nonviolent civil rights protest).

particular, *Cox v. Louisiana*, 379 U.S. 576 (1965), is particularly instructive now. *Cox* stands for the proposition that speech cannot be silenced merely because its opponents may react negatively or violently, a point that is particularly true in cases involving racial dynamics. *Id*. at 445.

The City's criminalization of protests here must be viewed against the long-standing history of passing laws and arresting individuals aligned with the civil rights movement. While it raises a few passing references to COVID, the City's brief makes clear that its real concern was to stop protests, because they were a distraction for law enforcement officers trying to arrest a very small number of individuals engaged in property damage.

Case after case, including those involving the exact kind of political protests at issue here, makes clear that the government's generic interest in promoting public safety and preventing crime takes a backseat to the fundamental right of free speech. *See, e.g., Shuttlesworth*, 394 U.S. at 153 ("Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade…."). The government cannot silence protected expression because it is difficult or complicated from a law enforcement perspective to punish crime. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 254-5 (2002) ("The argument, in essence, is that protected speech may be banned as a means to ban unprotected speech. This analysis turns the First Amendment upside down.").

But the City argues the opposite:  that speech must be silenced so that crime can be stopped. The First Amendment unquestionably rejects this approach. By criminalizing the protests, the City actually *increased* rather than prevented crime. As the Supreme Court counseled in *Cox* and *Free Speech Coalition*, the government cannot transform lawful, constitutionally-protected expression into a crime merely because of the risk that other criminal activity may be hard to police.

## 2. The City has not identified a compelling interest

The curfew also fails to meet strict scrutiny because the City lacks a compelling government interest. In the Emergency Orders, the City attempts to walk two paths. Primarily, it claims that that it seeks to protect against "destruction and violence" and provide "security and enforcement." Yet in the same breath, the City disparately claims that the purpose of the order is to protect first responders from the spread of COVID-19. The City's unwillingness to articulate a single reason why it needs the curfew is telling. It confesses an awareness that the curfew is not well founded to meet constitutional standards.

Even assuming both of these are the real reasons for the curfew, neither are compelling. With respect to the prevention of COVID-19, the imposition of the curfew is completely unrelated to any effort to abate the spread of the virus. With people free to protest and gather all day long, with no mandatory mask requirements, with restaurants, gyms and yoga studios, and day care centers open, a night time curfew could do nothing to limit transmission of the coronavirus.

The prevention of destruction and violence is also not a compelling interest distinct from City government's core function. The prevention of crime and protection of property are the reason for the establishment of a police force and the sole charge of that institution. The City's recitation of this objective does little more than to state the purpose of government. Neither of the claimed reasons for the Curfew are compelling government interests that can withstand strict scrutiny.

## 3. The Curfew is not narrowly tailored

A party challenging a restriction based on "narrow tailoring" may succeed in doing so by showing that there are less restrictive means by which the government could achieve its objective. *See e.g. Burson*, 504 U.S. at 208-9. Under this standard, the curfew violates the First Amendment because it is not narrowly tailored. Whether the City's objective is to prevent crime and provide

security, or to abate the spread of COVID-19, the curfew fails this test. The curfew is both overinclusive because it burdens speech excessively, and underinclusive because it permits conduct which defeats the ostensible purposes.

In its attempts to prevent crime, the City enforced the curfew by deploying hundreds of officers in riot armor, tear gassing demonstrators, corralling them, and arresting them *en masse*. Yet, with the exact same police resources, the City could have protected against crime by simply allowing police to patrol the demonstrations and intervening to apprehend perpetrators of criminal activity. The suppression of protected demonstrations (and ordinary daily life in the City) added nothing to the ability of the police to patrol and protect the City.

The overbreadth of the City's curfew is similar to *Schneider v. New Jersey*, 308 U.S. 147 (1939). In *Schneider*, the Court voided an ordinance that forbade the handing out of leaflets on public streets and held that the municipality could not prohibit one person's protected speech in order to prevent another person's crime. *Id*. at 162.

The same reasoning applies to the curfew. The City can patrol to prevent crime and to investigate and prosecute crime when it occurs, but it may not issue a blanket prohibition on all outdoor political gatherings. In *Schneider*, the Supreme Court held unequivocally that protected speech does not lose its protection even when it imposes burdens upon society, and incidental crime is one such burden. The curfew is unforgivably overbroad in this respect.

The lack of narrow tailoring is even more obvious with respect to the City's claimed goal of preventing COVID-19, which the City could effectively accomplish without limiting speech. Had the City simply imposed mask and social distancing mandates, the risks would have been effectively controlled without imposing any burden on protected speech.

**4. The Curfew is underinclusive**

The underinclusiveness of the curfew also demonstrates that it is not narrowly tailored to protect the purported government interests. By its terms, the curfew is inapplicable to "essential workers," "heath care professionals," and "persons experiencing homelessness." The curfew is at once overinclusive in that it restricts excessive amounts of protected speech that pose no threat, yet also underinclusive in exempting from restriction many persons who may increase the risk of crime. These facts demonstrate that the Curfew is not narrowly tailored and is therefore invalid under the First Amendment.

**C. The Curfew is not a valid time, place, and manner restriction because it burdens substantial amounts of protected speech leaving no viable alternative for demonstrations**

The Curfew fails as a TPM restriction because it is too broad and gives demonstrators no other options to engage in expressive conduct. In order to pass constitutional muster, a TPM restriction: 1) may not burden substantially more speech than is necessary to further the government's legitimate interests; and, 2) must leave open ample alternative channels of communication. *Ward*, 491 U.S. at 799.

Insofar as the City imposed a blanket restriction on any person "appearing in a public space," the curfew burdens more speech than necessary. The City made no attempt to provide for places where protected speech could take place while reducing the risk of property damage. Nor did it allow for permitting of scheduled demonstrations exempt from the curfew. In its outright ban of all outdoor demonstrations throughout the City, the curfew leaves no alternative.

The City claims that the curfew meets TPM criteria because it allows any demonstration to take place during the daylight hours. Yet, for many people, these hours offer no option at all. For a diverse population of demonstrators, constraints of work, education, or availability of child

care prevent them from joining a demonstration during the hours selected by the City. With criminal penalties applicable to any demonstration in the whole of the nighttime, many people were left with no alternative to engage in protected speech.

In at least one respect the curfew itself demonstrates how it burdens more speech than necessary and provides no meaningful alternative: on May 30, the curfew applied to only four neighborhoods, thus allowing expressive conduct in other places in the City. Yet, the following day, and in the succeeding Second and Third Emergency Orders, the Mayor expanded the curfew's sweep to the whole city. The Second and Third Emergency Orders thus represent an exhaustive, complete ban on all protected demonstrations with no alternative left open. The curfew therefore fails to meet even the more permissive constitutional standard applicable to a TPM restriction.

## IV. The Curfew Violates the Fourteenth Amendment's Prohibition on Selective Enforcement

### A. The Curfew violates the Equal Protection Clause because it unfairly and disproportionately affects African-American people, communities, and supporters

The Fourteenth Amendment Equal Protection Clause prohibits "selective enforcement," or a "selection [that] was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boyles*, 368 U.S. 448, 456 (1962). Selective enforcement arises when the state treats a person differently compared to those similarly situated to punish exercise of a constitutional right. *Arnold v. City of Columbus*, 515 Fed. Appx. 524, 539 (6th Cir. 2013). Selective enforcement requires showing a discriminatory purpose and effect. *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). A discriminatory purpose can be shown through evidence that the state enforced the law partially because of, and not in spite of, "its adverse effects on an identifiable group." *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005).

13

A selective enforcement claim proceeds in three parts. First, it must be shown that an official singled out a group exercising constitutional rights and makes a *prima facie* showing that the official does not go after comparators. *Gardenhire*, 205 F.3d at 319. Second, the official must demonstrate the absence of a discriminatory purpose. *Id.* Finally, the criminal defendant's or civil plaintiff's group must suffer a discriminatory effect. *Id.*

Strict scrutiny applies where a classification "impermissibly interferes with the exercise of" free speech. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). In the context of free speech, a decision to prosecute one group of individuals exercising their First Amendment rights while allowing others to continue a prohibited course of conduct constitutes selective enforcement. *See Macko v. Byron*, 555 F.Supp. 470, 477-8 (N.D. Ohio 1982) (finding that prosecuting plaintiffs for making false statements in campaign while not prosecuting others not in the campaign who also made false statements fulfilled *prima facie* discriminatory prosecution case).

Even facially race-neutral enactments may infringe upon constitutional rights to equal protection. "[T]he law is clearly established that a state actor cannot apply a neutral statute with a purpose to discriminate invidiously on the basis of race. [...] To determine whether there was an impermissible racial motive, courts look to the Arlington Heights factors." *Gay v. Cabinet for Health & Family Servs. Dept.*, 2019 U.S. App. LEXIS 2336 (6th Cir. 2019), at *12 (internal citations omitted).[3]

---

[3] These factors are: "The impact of the official action -- whether it 'bears more heavily on one race than another,' [...] may provide an important starting point." [...] "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." [...] "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." [...] "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." [...] "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important

From its inception, the City has utilized the curfew order solely to punish those participating in the George Floyd demonstrations. The City did not impose curfews and utilize violence against speakers when 1.25 to 1.5 million people descended on Cincinnati for Blink 2019,[4] when approximately 100,000 people attended Cincinnati Pride,[5] or when approximately 10,000 people attended the Women's March in 2018.[6] This pattern of selective enforcement only reinforces the content-based nature of the curfew itself. It was adopted to target speech because of its content, and it is being enforced in a similarly discriminatory manner.

The curfew weighed most heavily against black residents of Cincinnati because it was implemented and enforced primarily in black neighborhoods and against demonstrators engaged in protest for racial equality. The curfew initially applied to only four neighborhoods which contain at least two predominately black populations. After the curfew was expanded citywide, the enforcement and arrests were concentrated in these same areas. Even when the City arrested white people and other non-African Americans, its enforcement was targeted at persons who acted in solidarity with the black community. The net effect of the curfew enforcement was the imposition of a harsh crackdown on those who criticized the government in support of black people.

---

by the decisionmaker strongly favor a decision contrary to the one reached." [….]. "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports." *Village of Arlington Hts. v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 266-8 (1977).

[4] WLWT Digital Staff, "BLINK 2019 was largest event in region's history, organizers say," WLWT 5 (Oct. 16, 2019), https://www.wlwt.com/article/blink-was-largest-event-in-cincinnati-area-history-organizers-say/29491583#.

[5] Kathryn Robinson, "Cincinnati Pride celebrates 46th year on Saturday," Local 12 (June 22, 2019), https://local12.com/news/local/cincinnati-pride-celebrates-46th-year-on-saturday#:~:text=CINCINNATI%20(WKRC)%20%2D%20Cincinnati%20Pride,the%20modern%20day%20LGBTQ%20movement.

[6] Ken Brown, "10,000 show up for Cincinnati's second Women's March," FOX 19 (January 19, 2018), https://www.fox19.com/story/37307145/thousands-expected-to-come-out-for-womens-march/.

The imposition of a curfew is among the most draconian measures that a government may enact. Yet when curfews have been imposed in Cincinnati, they have been deployed only against protest in the black community. In 1968, at the time of the assassination of Rev. Martin Luther King Jr., the City imposed a curfew and arrested 220 people. In 2001, the City imposed a curfew and arrested over 800 people when demonstrations arose after the killing of Timothy Thomas by Cincinnati police. The City used a similar tactic in 1996, when it passed an ordinance excluding certain individuals from entering the historically black neighborhood of Over-the-Rhine. The restriction was later found to be unconstitutional. *See Johnson*, 310 F.3d at 487. In short, there is a history in Cincinnati of disproportionately employing the most extreme police actions against African-American communities at the first sign of disruption.

Yet, the City does not react so harshly in response to gatherings of principally white populations. The City welcomes large and unruly crowds of sports fans which annually generate scores of arrests for vandalism, fighting, and alcohol related offenses. Rather than attempt to limit such gatherings, the City permits sports fans to convene on its property, tolerates alcohol and open fires, furnishes outdoor bathrooms, and cleans up the massive amounts of trash afterward. Similarly, when demonstrations of principally white demonstrators take to the streets, the City manages to accommodate the protest without mass arrests. In 2011, when Occupy Cincinnati demonstrators spent weeks in a City park, the arrestees were routinely cited for minor misdemeanor and fourth-degree offenses without physical arrest. Yet hundreds of persons charged with Curfew violation in the instant case were uniformly charged with first-degree misdemeanors despite the absence of a single factual allegation of risk to person or property.

Taken together, the facts demonstrate disparate treatment that constitutes a denial of equal protection. The history of disproportionate police response to the black community and the severity of the government restrictions and enforcement of the Curfew in this case are unconstitutional.

**B.  Plaintiffs have standing to assert their selective enforcement claims**

The City argues for an overly strict application of standing requirements in order to avoid liability while ignoring Supreme Court precedent that standing requirements are relaxed in the context of First-Amendment related claims.  As Plaintiffs have a close relationship with the protestors, and potential criminal prosecution was a hindrance to Plaintiffs' abilities to protect their interest, Plaintiffs have standing.  As the Supreme Court has held:

> We have adhered to the rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." […] We have not treated this rule as absolute, however, recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another. But we have limited this exception by requiring that a party seeking third-party standing make two additional showings. First, we have asked whether the party asserting the right has a "close" relationship with the person who possesses the right.  Second, we have considered whether there is a "hindrance" to the possessor's ability to protect his own interests.
>
> We have been quite forgiving with these criteria in certain circumstances.  ***Within the context of the First Amendment, for example, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing.***

*Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004) (internal citations and quotations omitted) (emphasis added).  Strict standing requirements are antithetical to claims involving protected speech when criminal prosecution is an obstacle to speakers' ability to protect their interest:

> Within the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations  on standing. Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the

> statute challenged. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Secy. of Maryland v. Joseph H. Munson Co*., 467 U.S. 947, 956-7 (1984) (internal citations and quotations omitted) (emphasis added).

Here, Plaintiffs were deterred from exercising their constitutional right to free speech to protest police brutality. Although they were not arrested for violating the curfew, they were protesting alongside those who were. Plaintiffs should not be required to be arrested in order to assert their constitutional rights. Moreover, by criminalizing the protests through its selective enforcement, the City affected the reputation of Plaintiffs. *See Meese v. Keene*, 481 U.S. 465, 472-77 (1987) (finding that the Department of Justice's enforcement of a statute that employed the term "political propaganda" created a risk of injury to plaintiff's reputation that could be fairly traced to the defendant's conduct). Plaintiffs have standing to assert their selective enforcement claims.

## V. The Curfew violates the Doctrine of Separation of Powers

### A. The declaration of an emergency requires affirmative action by Council

The Charter contains the term "declaration of an emergency" only once, and the reference is within Article II, which governs the legislative power of Council:

> The initiative and referendum powers are reserved to the people of the city on all questions which the council is authorized to control by legislative action; such powers shall be exercised in the manner provided by the laws of the state of Ohio. Emergency ordinances upon a yay and nay vote must receive the vote of a majority of the members elected to the council, and ***the declaration of an emergency*** and the reasons for the necessity of declaring said ordinances to be emergency measures shall be set forth in one section of the ordinance, which section shall be passed only upon a yay and nay vote of two-thirds of the members elected to the council upon a separate roll call thereon. If the emergency section fails of passage, the clerk shall strike it from the ordinance and the ordinance shall take effect at the earliest time allowed by law.

Charter, Article II, Section 3 (emphasis added).  This Section does not purport to limit the authority of Council to declare emergencies in any respect.  While the vesting of this power includes its use in the passage of emergency ordinances, it is the only place in the entirety of the Charter where the declaration of an emergency is specifically mentioned.

Conversely, Article III governing the Mayor does not mention declaration of an emergency at all.  The only mention of "emergency" in Article III is accompanied by a requirement that any emergency action taken by the Mayor require Council's consent.

> In time of public danger or emergency, the Mayor may, ***with the consent of the Council***, take command of the police, maintain order and enforce the law.

Charter, Article III, Section 2 (emphasis added).

Thus, by the plain text of the Charter, any emergency powers that the Mayor may have are explicitly limited in two critical ways: 1) an emergency must exist, and 2) Council must consent.  Article III of the Charter does not grant the Mayor authority to declare an emergency and provides no guidance as to how Council may provide its consent. Yet Article II, Section 3 answers both these questions. That section specifically provides that an emergency may be declared and emergency action taken by Council upon a roll call vote in which two-thirds of Council vote yes.

The Charter is the constitution and foundation of the City's government.  In addition, the Charter of the City of Cincinnati is unique to this City.  If the Mayor has any power, it comes from the Charter.  Similarly, where any particular power is given to Council by the Charter, such a grant excludes the possibility that the Mayor may exercise it.

Cincinnati is not the first City where emergency powers have been improperly invoked to impose a curfew, and this Court will not be the first to set such an action aside.  In a very similar case, the Florida Supreme Court enjoined the enforcement of a curfew declared by a mayor when

the power to do so was vested in the legislative council. *See Municipal Ct., Ft. Lauderdale v. Patrick*, 254 So. 2d 193 (Fla. 1971). In this case, just as in *Patrick*, the Mayor exceeded his powers.

## B. The COVID Declaration was not approved by Council

The Council minutes do not contain any record of a vote by Council "approving" the COVID Declaration. The COVID declaration was presented to Council, but no vote was taken. Although the Charter does not specify how Council may provide its consent, such consent should not be implied in order to grant emergency powers to the Mayor. It is Council's practice to grant consent in response to a formal request from the Mayor, which is considered in a public meeting and acted upon by roll call vote. Thus, there is established practice by which the Mayor may obtain the consent of Council. That practice was not followed in the execution of the COVID declaration, a unilateral act of the Mayor without Council's approval before or after the fact.

Furthermore, the COVID Declaration would expire by its own terms after 60 days. Therefore it lapsed, at the latest, on May 19, more than ten days before the issuance of the First Curfew Order. The City has also not provided any citation to the action of Council that would be necessary to extend the emergency declaration.

## C. Council did not give its consent to the Curfew Orders

There is no record in Council's Minutes of any vote in which it consented to the imposition of the curfew, nor has the City specified when or how consent was provided. The Council's minutes show that it met on June 3, after issuance of the curfew, and that the curfew orders were filed in its records. However, the Mayor did not request Council's consent, and no roll call vote was taken on the curfew. Under Article II, Section 3, Council's consent must be provided in some form. There is no indication Council ever consented.

**D. The Mayor's emergency powers, if properly invoked, are not limitless and must be exercised as provided within an emergency declaration**

Even assuming that the Mayor has emergency powers pursuant to the COVID Declaration, the imposition of a Curfew for purposes completely unrelated to COVID was invalid. When the City declares an emergency for the purpose of addressing a public health crisis, it may not abuse those powers to impose severe restrictions that are completely unrelated to public health.

**E. The purpose of the Curfew is unrelated to the stated purpose for the COVID Declaration**

The Curfew is invalid as an exercise of emergency powers because the means employed and goals pursued in the execution of the Curfew are completely unrelated to the stated purpose in the COVID Declaration. The Mayor declared an emergency related to COVID, but he enforced a curfew addressing demonstrations. The two are unrelated, and the curfew was therefore invalid.

The language of the COVID Declaration was clear in stating its purpose:

> The Declaration of Emergency is necessary to allow the City of Cincinnati to take appropriate action to protect against the spread of COVID-19 in Cincinnati and to protect vulnerable populations in Cincinnati and the Greater Cincinnati Region from contracting COVID-19.

The Curfew Orders were clear in addressing a completely separate problem:

> The need for this [Curfew] order arises from destruction and violence in several areas of the City of Cincinnati...; the threat of continued and escalating violence,; the need for security and enforcement support for the Cincinnati Police Department; and the need to protect the City's first responders from the spread of COVID-19.

The reference in the curfew orders to COVID is gratuitous and calculated. The curfew was not intended to limit the spread of COVID. To the contrary, enforcement of the curfew placed police in close contact with hundreds of protesters and resulted in the close confinement of hundreds of people under conditions where masks were prohibited. The purpose of the curfew was to clear the streets of protesters, not to mitigate the spread of a virus.

In the criminal complaints filed against the protestors, the City stated as much:

> The purpose of [the Curfew] was to abate the destruction and violence associated with illegal rioting in response to law enforcement personnel.  In the late hours of May 29, 2020through the early hours of May 30, 2020, rioters destroyed property, looted businesses, and attached Cincinnati Police officers.

At the time of the COVID Declaration, no one could have foreseen the groundswell of demonstrations that would occur in May and June.  The demonstrations did not arise from, nor have any relationship to COVID-19.  The two events are distinct in nature and in consequences. The declaration of an emergency to address COVID conveys no authority to quell demonstrations.

Furthermore, the COVID declaration did not request Council's consent to the tactics employed by curfew orders. Under Article III, Section 2 of the Charter, in order to "take command of the police, maintain order and enforce the law," the Mayor must have the consent of Council. To obtain Council's consent to such extraordinary actions, the Mayor necessarily would need to request it specifically, but the COVID declaration gave no hint that the Mayor would deploy police to shut down the City and arrest hundreds of protesters. Even if Council had given consent to the COVID declaration, the scope of that consent was only to "take appropriate action to protect against the spread of COVID-19." The Mayor declared a COVID emergency and sought authority to address it.  He did not thereby gain any power that might be exercised in any emergency.

The City argues that once an emergency has been declared for any reason, the Mayor may exercise emergency powers in any way he wishes even when such exercise has no relationship to the cause of the emergency. This position is unsustainable. Emergency powers, like any government power, are limited by the separation of powers and constitutional freedoms.

The City's view of the versatility and scope of emergency executive power is refuted by recent decisions invalidating emergency COVID restrictions. In such cases, courts have made clear that the COVID crisis has not diminished the importance of fundamental rights or the applicability

of constitutional principles. *See Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614-5, 2020 U.S. App. LEXIS 14213 (6th Cir. 2020) (enjoining restriction on religious gatherings); *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 927, 2020 U.S. App. LEXIS 13357, 2020 FED App. 0127 (6th Cir. 2020) (enjoining restrictions on abortions); *Lynchburg Range & Training, LLC v. Northam*, 2020 Va. Cir. LEXIS 57 (enjoining restrictions on Second Amendment activities). These cases show that COVID does not grant government unlimited powers at the expense of individual rights. The COVID declaration did not empower the Mayor to impose an unrelated curfew.

## F. Council's attempt to delegate powers and duties specifically vested in the legislature by the Charter is invalid

The City relies upon Article XVIII of the Administrative Code, "Public Danger or Emergency" as authority for the curfew orders and the COVID Declaration. The City's reliance on the Administrative Code is misplaced because the subject is specifically addressed by the Charter. Council's attempt to delegate a power specifically vested in it by the Charter was invalid.

The prohibition against delegation by a legislature is illuminated in the case in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). In *Schechter*, a defendant was convicted of a criminal offense under the "Live Poultry Code," established by President Roosevelt under a legislative mandate from Congress. The government maintained that it was necessary for Congress to delegate the power to establish the code, including criminal offenses, to the President because of the Great Depression and the critical importance of agricultural industries to the economy and the food supply. The Supreme Court rejected the act as an unconstitutional delegation of a core legislative function. The Court observed that "[e]xtraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power." *Id*. at 528.

This case poses an even clearer example of impermissible delegation.  Under the Charter, Council is vested with a specific and critical responsibility in an emergency.   Under Article II, Council is given sole authority to make an emergency declaration.  Under Article III, Council's consent is required in order to authorize the Mayor to take command of the Police.  Both of these duties are explicit and clear, and come directly from the electors who passed the Charter.  Council's attempt to delegate its duties was violative of principles of separation of powers that are also applicable under Ohio law (*See Matz v. J.L. Curtis Cartage Co*., 7 N.E.2d 220 (Ohio 1937)), and under the Charter itself ("All legislative powers of the city shall be vested…in the Council.").

The language of Article III, Section 2 of the Charter provides another reason why the attempt at delegation in Article XVIII of the Administrative Code was invalid. The phrase "In time of danger or emergency" provides not just the conditions under which emergencies may exist, but also the timing. Consent of Council is required ***at the time the emergency arises***. The Charter commands that Council consider the conditions that may comprise an emergency before ceding broad powers to the Mayor. The provision of the Administrative Code which purports to provide consent in advance to the Mayor's assertion of power violates the spirit and the letter of the Charter.

## VI.     The Curfew is preempted by state law

To the extent the Mayor's curfew was intended to address COVID, it was preempted by state law.  Under *Canton v. State*, 2002-Ohio-2005, at ¶ 36-37, home rule municipalities may not adopt legislation that conflicts with general state laws, which are those that adopt general rules of conduct uniformly applicable throughout the state. In this instance, the State of Ohio adopted highly specific, statewide conduct regulations related to the pandemic. *See, e.g.,* Amended Ohio Health Director's Stay at Home Order (Apr. 2, 2020).  These orders did not ban individuals from

appearing in public like the Mayor's curfew order did. Given the existence of statewide regulations, the City of Cincinnati was not free to adopt local restrictions in conflict with state law.

## VII.    Conclusion

For the foregoing reasons, the City's Motion for Judgment on the Pleadings should be denied.

Respectfully submitted,

/s/ *Jennifer M. Kinsley*
JENNIFER M. KINSLEY (Ohio Bar No. 0071629)
Kinsley Law Office
Post Office Box 19478
Cincinnati, Ohio 45219
(513) 708-2595
Kinsleylawofffice@gmail.com

/s/ *H. Louis Sirkin*
H. LOUIS SIRKIN (Ohio Bar No. 0024573)
JOHN D. HOLSCHUH III (Ohio Bar No. 0095377)
Santen & Hughes
600 Vine Street, Suite 2700
Cincinnati, Ohio 45202
(513) 721-4450
hls@santenhughes.com
jdhiii@santenhughes.com
*Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that an exact copy of the foregoing document was provided the Court's electronic filing and notification system (CM/ECF) to all counsel of record on the 17th day of February, 2021.

/s/ *H. Louis Sirkin*
H. LOUIS SIRKIN (Ohio Bar No. 0024573)
*Counsel for Plaintiffs*