UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ALEXANDRA GRAFF, et al., | : | Case No. 1:20-cv-00449 |
| | : | |
| Plaintiffs, | : | Judge McFarland |
| | : | |
| v. | : | **CITY OF CINCINNATI'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS** |
| | : | |
| CITY OF CINCINNATI, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

Plaintiffs' opposition improperly and substantially relies upon allegations not contained within the pleadings to substantiate their arguments. But even considering the totality of the assertions made, the Emergency Curfew Orders were content neutral regulations of conduct under the First Amendment. In addition, there is no evidence of an official City policy of selective enforcement of the curfew under the Fourteenth Amendment. Plaintiffs have failed to argue there actually was a conflict between local and state regulations, thereby forfeiting the claim that the Emergency Curfew Orders violate the Home Rule Amendment. Nor have Plaintiffs made any argument in defense of their Open Meetings Act claim. Finally, curfew was properly ordered and implemented during the state of emergency under the City's Charter.

**A. The Emergency Curfew Orders did not violate the First Amendment.**

The Emergency Curfew Orders were a neutral time, place and manner restriction imposed to control unrest during a worldwide pandemic. *Hill v. Colorado*, 530 U.S. 703, 719 (2000) (citing *Ward v. Rock Against Racist*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Because the curfew was narrowly tailored to a substantial government interest, it did not violate the First Amendment as a content neutral regulation of conduct. *Ward*, 491 U. S. at 796.

Nor did the curfew curtail protected speech by failing to leave open viable alternatives. Finally, the curfew is not void for vagueness since Plaintiffs have not demonstrated it is vague in every application.

### 1. The Emergency Curfew Orders were neutral time, place, and manner regulations.

There is simply no truth to Plaintiffs' argument that the City's purpose in imposing the Emergency Curfew Orders was to suppress protests. The City's response to a decade of protests about police reform demonstrates that it enables, rather than suppresses, peaceful protests. But more to the question at hand, there is nothing within Plaintiffs' pleadings that would plausibly support the conclusion that the City intended to suppress protests. To the contrary, the fact that tens of thousands were able to protest suggests the opposite: that the curfew was imposed because of other concerns. (Doc. 10 ¶ 12). The City imposed a curfew because of the demonstrated inability of the police to contain violence and property damage without it. (Doc. 10 ¶ 12). When property damage escalated, the curfew was imposed. When the first curfew failed to contain the violence and a police officer was shot in his ballistic helmet, the curfew was expanded. (Doc. 10 ¶ 12). When the curfew was no longer needed, it was rescinded. (Doc. 10 ¶ 12). The curfew applied regardless of what the individual was doing and without reference to any kind of speech. Whether the individual was engaged in expressive activity or not was irrelevant to the imposition or enforcement of the curfew. There are no allegations in the Complaint that suggest otherwise.

Nor did the City choose to exempt any expressive activity by the media. The only argument Plaintiffs make that is based on an allegation from the Complaint is that the media were exempted. (Doc. 1 ¶ 28). Specifically, that the City chose to exempt expressive activity of the media. However, the exemption was not created by the City and so it cannot be concluded

2

that the exemption demonstrates a purpose to suppress certain viewpoints but not others. Moreover, the exemption is not for expressive activity and is enforceable without reference to the speaker's message.

The media exception was not created by the City in the Emergency Curfew Orders. There is no reference to the media in the curfew orders. But the exception is the result of the City's enforcement mechanism for the curfew, namely charging offenders with a violation of state law: misconduct at an emergency. *See* Ohio Revised Code § 2917.13. Within that offense, the Ohio General Assembly created an exception that exempts the media. Consequently, in the process of arresting individuals who violated the Emergency Curfew Orders, members of the media could not be charged. While the media were exempted, it was not by the City and certainly not because of any preference to the message, viewpoint, or expression by members of the media. Certainly, within "the media" were a variety of opinions and views, both sympathetic and unsympathetic to the protestors or their message. The exemption did not require the City to eliminate those speakers with viewpoints critical of the City or police or, in fact, any viewpoint or expression.

The exemption for the media was enforceable without reference to the speaker's message or viewpoint. It is simply a matter of answering the question of whether the individual is a member of the media. Contrary to Plaintiffs' argument, the enforcement did not require officials to analyze the message of the media. Indeed, there is no evidence that any official on behalf of the City was even aware of the messages the media was communicating or if they were communicating at all. For some members of the media, television for example, it is obvious when they are reporting. But, the vast majority of electronic media now employs different mass communication methods that can be utilized anywhere or at any time: livestreaming, tweeting, and posting stories on the internet. Consequently, the media exemption permitted the presence of

3

the media regardless of whether they were reporting or not. As a result, the curfew could be enforced without reference to the message of the speaker.

There is simply nothing to support the Plaintiffs' legal conclusion that the City's purpose in creating the curfew was to suppress protests. Because City's purpose was not to suppress protests, the Emergency Curfew Orders were content neutral.

> 2. **The Emergency Curfew Orders advanced a significant government interest and were not underinclusive.[1]**

The Emergency Curfew Orders were necessary to enable the tens of thousands who protested peacefully to exercise their First Amendment rights. It is indisputable that in the weeks and months after the death of George Floyd, tens of thousands of individuals demonstrated in Cincinnati about racial issues in policing. (Doc. 10 ¶ 12). Those demonstrations were only possible because the City was able to control the rioting that occurred after sunset. Plaintiffs' refusal to even acknowledge that the government has a legitimate interest in suppressing violence and disorder is dangerous. The danger is not just for those who might be victims of those offenses. It also endangers the First Amendment rights of those who protested peacefully by placing a preference on the rights of the individuals who engaged in or tolerated violence. As the U.S. Supreme Court has observed:

> The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.

---

[1] Whether a regulation of speech is underinclusive is only relevant to a strict scrutiny inquiry but is discussed here for economy. *R. A. V.* v. *St. Paul*, 505 U. S. 377, 387, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992).

*Cox v. Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (holding convictions of peaceful civil rights protestors based upon the threat or potential for violence violated the First Amendment). Despite Plaintiffs' refusal to acknowledge the weight of First Amendment jurisprudence that recognizes the legitimate government interest in maintaining peace and order, the Emergency Curfew Orders were intended to accomplish just that.

The City had the additional concern that grouping its law enforcement officers in such close proximity for extended periods of time created the risk of uncontrolled transmission of COVID-19 throughout the police department. If that occurred, the resulting breakdown in public safety might have been catastrophic. Plaintiffs posit that "a night time curfew could do nothing to limit transmission of the coronavirus," but a night time curfew is precisely what the Ohio Department of Health imposed for several months when COVID-19 infection and hospitalization rates were high. (Doc. 21 at 10). Since November 11, 2020, Ohioans were ordered to stay in their homes between 10:00 pm and 5:00 am every day.[2] That order expired (after several renewals) on February 11, 2021.[3] Simply stated, even the limited opportunity to prevent the transmission of COVID-19 is beneficial. Certainly, Plaintiffs' conclusion that "a night time curfew could do nothing to limit transmission of the coronavirus" is simply wrong.

Finally, there is no logic to Plaintiffs' argument that the curfew was underinclusive by exempting the homeless or doctors. It is unclear how exempting workers would "increase the risk of crime." (Doc. 21 at 12). There are no allegations that either group was involved in the unrest. The Emergency Curfew Orders advanced a legitimate government interest and were not underinclusive.

---

[2] https://coronavirus.ohio.gov/static/publicorders/health-order-encouraging-ohioans-to-stay-home.pdf
[3] https://coronavirus.ohio.gov/static/publicorders/fourth-amended-stay-safe-tonight-order.pdf

### 3. The Emergency Curfew Orders were narrowly tailored.

The curfew imposed by the City was tailored to the police department's ability to respond to the unrest. Plaintiffs suggest that the City's goals could have been achieved through other means. However, Plaintiffs' suggestion that officers patrolling in a socially distanced manner would have achieved the same result as the curfew does not acknowledge the reality faced by law enforcement in attempting to suppress mass property damage and violence.[4] As the City plead in its Answer, the amount of property destruction and violence that occurred exceeded the police department's ability to respond. (Doc. 10 ¶ 12). As a result, order broke down. The ability of the offenders to conceal themselves in darkness with masks and in crowds frustrated regular enforcement of criminal laws. (Doc. 10 ¶ 12). The curfew was imposed in response. It was limited to the geographic areas where the unrest occurred. (Doc. 10 ¶ 12). However, when the rioting extended into other neighborhoods leading to an officer being shot in his helmet, the curfew was similarly extended to those neighborhoods. (Doc. 10 ¶ 12). In reality, the City tailored it response to the unrest and imposed a city-wide curfew only after efforts to engage in regular enforcement and a neighborhood specific curfew failed. (Doc. 10 ¶ 12). Nor could the City impose a social distancing requirement for officers who, by necessity, had to gather into groups in order to control the rioting groups.

The City exhausted its options to restore order prior to implementing a curfew. Simply stated, the City had a choice: (1) continue traditional enforcement which would allow crowds to cause potentially millions of dollars in damage to downtown area property owners already

---

[4] The facts of this case cannot be compared to the precedent cited by Plaintiffs in *Schneider v. New Jersey*. *Schneider* involved required registration for solicitors of charitable contributions, not hundreds of people gathered in an unruly mob. *Schneider v. New Jersey*, 308 U.S. 147 (1939). Clearly law enforcement has both the ability and opportunity to address the criminality associated with unidentified individuals wandering residential neighborhoods. But controlling a group of hundreds of individuals who are engaged in disorderly behavior is substantially more difficult. The options are fewer and the stakes are higher as a failure to restore order could result in substantial destruction. Similarly, reference to *Cox v. Louisiana* is inappropriate since the convictions there were of peaceful protestors who were accused of creating the potential for violence. *Cox*, 379 U.S. at 554.

impacted by the pandemic, condone an environment where lawful protestors could not express their views due to danger, and expose officers to an extremely contagious disease; or (2) impose a curfew to regain order, protect people and property, slow the spread of disease, allow an exhausted police force to rest, and allow the protests to continue. The City made the right choice, and the Emergency Curfew Orders are narrowly tailored.

### 4. The Emergency Curfew Orders were not substantially overbroad.

Plaintiffs, as well as any other person, were not substantially limited by the curfew. There is no First Amendment jurisprudence that suggests that the City must provide a forum to every person or a particular forum to everyone without limitation. To the contrary, the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647, 101 S. Ct. 2559, 2564 (1981). Plaintiffs are not entitled to their "first or best choice" or even one that provides the same audience of impact for the speech. *See Heffron*, 452 U.S. at 647; *Ward*, 491 U.S. at 802. In *Clark v. Community for Creative Non-Violence*, the Supreme Court upheld an overnight ban on sleeping and camping in certain parks that were the location of demonstrations. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

None of the alternatives suggested by Plaintiffs would have been viable. Even under the most restrictive version of the curfew, a person who worked a 12-hour shift, three days in a row would have had two hours each day to participate in demonstrations. Moreover, it is not clear why child care would be a barrier to participation in peaceful protests unless the protests were not safe for children. Plaintiffs' desire to shield children from the activity occurring at the protests reveals the true conditions during the unrest. Similarly, the suggestion that an area could

be established to "reduce the risk of property damage" seems to acknowledge the widespread and destructive nature of the unrest. (Doc. 21 at 12). Regardless, Plaintiffs do not explain why some community members must accept the burden of the violence, destruction, and disturbance. Certainly, such activities are not protected by the First Amendment. The City has no obligation to accommodate such criminal behavior.

Because Plaintiffs fail to identify a substantial amount of protected expression that was foreclosed by the curfew, the Emergency Curfew Orders were not substantially over broad.

### 5. The Emergency Curfew Orders were not unconstitutionally vague.

Even though Plaintiffs did not raise a void for vagueness claim anywhere in their Complaint, the emergency curfew orders withstand this scrutiny as well. "A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process. To succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 497.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The U.S. Supreme Court has held that the "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (citing *Hoffman Estates*, 455 U.S. at 498); *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Grayned*, 408 U.S. 104; *Papachristou v. City of*

8

*Jacksonville*, 405 U.S. 156, 31 L.Ed.2d 110, 92 S. Ct. 839 (1972); *Connally v. General Constr. Co.*, 269 U.S. 385, 70 L.Ed. 322, 46 S. Ct. 126 (1926)).

An enactment is not void for vagueness simply because it could be worded more precisely or with additional certainty. *Grayned*, 408 U.S. at 110 (holding "mathematical certainty" is not required). *See also N. Olmsted Chamber of Commerce v. City of N. Olmsted*, N.D. Ohio CASE NO. 1:98CV 0810, 1999 U.S. Dist. LEXIS 20808, at *89 (Aug. 17, 1999) (noting "[t]he vagueness doctrine does not require absolute precision from lawmakers"). "[I]t will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Grayned,* 408 U.S. at 112 n.15 (quoting *American Communs. Ass'n v. Douds,* 339 U.S. 382, 412 (1950)). Valid laws may be written with "flexibility and reasonable breadth, rather than meticulous specificity" if "a person of reasonable intelligence can discern what the law mandates or prohibits." *See Grayned,* 408 U.S. at 108; *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir.1999).

Plaintiffs failed to demonstrate that the Emergency Curfew Orders did not provide notice of the proscribes conduct in every application. While Plaintiffs' vagueness challenge appears nowhere in the pleadings,[5] Plaintiffs now argue that the failure to define certain terms renders the Emergency Curfew Orders unconstitutionally vague. However, considering the primary operative language of the curfew demonstrates that the orders are not vague in every application.

---

[5] While a complaint does not need to provide formal legal theories for recovery, it does have to provide notice of the harm suffered by the plaintiff. *Abrams v. Nucor Steel Marion, Inc.*, 694 F.App'x 974, 983 (6th Cir.2017) (citing *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346-47, 190 L. Ed. 2d 309 (2014)). In this case, Plaintiffs have failed to allege any facts that would support a claim that the Emergency Curfew Orders are vague. Indeed, the word "vague" or any permutation or synonym of "vague" does not appear in the Complaint. There are no allegations that any vagueness in the Emergency Curfew Orders caused Plaintiffs to act or behave differently. Consequently, it does not appear that whether the orders were vague had any actual impact on Plaintiffs or caused them to suffer any harm, and the City objects to the inclusion of this argument, for the first time, in a response to a dispositive motion.

Similarly, the exceptions within the orders are not so vague in every application as to render them unconstitutional.

### a. Prohibiting an individual from "appearing in public spaces" is not vague.

The Emergency Curfew Orders mandate that "[i]ndividuals are prohibited from appearing in . . . public spaces." Both the terms "appearing in" and "public spaces" are clear in their everyday meaning. Merriam Webster's Dictionary defines "[p]ublic" as "a place accessible or visible to the public – usually used in the phrase in public"; and it defines "[s]pace" as "a limited extent in one, two, or three dimensions: Distance, Area, Volume." The Cambridge dictionary defines "space" as "an empty area that is available to be used." At least two other courts have considered laws regarding restriction in "public space" in the context of a void-for-vagueness challenge, and neither found it to be impermissibly vague. *See, e.g., Alexander v. Gov't of the Dist. of Columbia*, 2020 U.S. Dist. LEXIS 115856 (D.C. law prohibiting the obstruction of "public spaces" not found void for vagueness); *Betancourt v. Bloomberg*, 448 F.3d 547 (2d Cir.2006) (NYC ordinance prohibiting obstruction of "public spaces" not found void for vagueness).

### b. The exceptions to the Emergency Curfew Orders are not vague.

The exceptions that are provided to the Emergency Curfew Order can likewise be understood by their everyday, common meaning. Plaintiffs argue that the use of the terms "healthcare professional," "persons experiencing homelessness," and "essential worker" are vague based on the lack of definition in the Emergency Curfew Orders. However, there is no requirement that terms must be defined to avoid vagueness.[6]

---

[6] Plaintiffs do not acknowledge that "essential worker" became common parlance during this pandemic. The Ohio Department of Health routinely referred to the U.S. Department of Homeland Security's guidance on essential workers and infrastructure as an exemption from its orders. *See also*, https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce. There are a whole host of terms that are now common in 2020 that were alien in 2019 like "coronavirus," "N95 mask," and "social distancing." The use of "essential worker" in the curfew

### c. The preamble does not render the Emergency Curfew Orders vague.

Plaintiffs also point to the preamble of the Emergency Curfew Orders to argue it was unclear whether the curfew would even be enforced. Specifically, the prefatory language indicates that:

> [T]hese conditions presently constitute a clear and present danger to the health, safety and property of the citizens of Cincinnati and may require enhanced enforcement authority and security resources to protect the lives and property to those who live, work, and do business in Cincinnati.

This language occurs in the preamble as a description of the statement of conditions regarding why the state of emergency was declared. In particular, the preamble indicates that traditional enforcement of criminal laws cannot provide security to the citizens of Cincinnati, based on the chaos of the prior evening. The language does not modify or even appear in the same paragraph as the actual order to not appear in public. Moreover, the preamble does not imbue law enforcement officers or judges with discretion to enforce the curfew. There is no question that the preamble does not indicate that enforcement will not occur or that officers may implement it at their discretion. The preamble does not detract from the prohibition to not appear in public. It merely indicates that the conditions in the future may or may not be consistent with the underlying facts of the curfew order. Contrary to Plaintiffs' suggestion, there is no evidence of discrimination in the enforcement of the curfew in this case. The Emergency Curfew Orders are not unconstitutionally vague.

### B. The City did not violate the Fourteenth Amendment by selective enforcement of the Emergency Curfew Order.

Plaintiffs have not addressed the flaws in their pleadings with respect to their selective enforcement claim. As a preliminary matter, Plaintiffs did not provide any response that

---

order is not unconstitutionally vague. While there could always be some hypothetical scenario in which an employee wonders whether he or she is actually necessary to a business or society in particular circumstances, it does not render the specific exception vague.

11

Plaintiffs have failed to establish municipal liability for the enforcement of the Emergency Curfew Orders under *Monell*. There are no allegations of a decision or official policy by the City to selectively enforce the Emergency Curfew Orders against anyone because of a protected status. Consequently, Plaintiff's theory of recovery is based on vicarious municipal liability, which is expressly foreclosed by *Monell*. *See Martin v. Girard*, 6th Cir. No. 98-1215, 2000 U.S. App. LEXIS 11454, at *7 (May 12, 2000).

Moreover, even if the City was vicariously liable, there are no allegations to support the conclusory statement that there was selective enforcement. Plaintiffs make sweeping assertions of racism as the basis for enforcement of the curfew. Notably lacking is any reference to their own pleadings because Plaintiff's Complaint fails to provide any support to the allegations they now make. Regardless, while Plaintiffs purport to claim that the City discriminated against African Americans through enforcement of the Emergency Curfew Orders, there is no information about the demographics of who was arrested. Indeed, as Plaintiffs are well aware, the individuals arrested under the Emergency Curfew Orders were predominantly white, not African American.[7] While that fact is not in Plaintiffs' pleadings, it explains the paucity of information to support their erroneous legal conclusions.

Finally, Plaintiffs make the assertion they do not have to demonstrate any actual harm to have standing to make a selective enforcement claim. Plaintiffs cite to U.S. Supreme Court precedents that generally provide there are lower barriers to standing in making First Amendment claims. However, Plaintiffs fail to even address the binding Sixth Circuit precedents cited by the City that pertain to selective enforcement in the context of First Amendment, in particular *Daubenmire v. City of Columbus*, 507 F.3d 383, 390 (6th Cir. 2007). Plaintiffs have not satisfied the "demanding standard" of a selective enforcement claim by providing "clear

---

[7] Of all the 493 arrests for enforcement of the curfew, 34.8% of the arrested identified as black.

evidence" to rebut the "strong presumption that the state actors have properly discharged their official duties." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)(quoting *United States v. Armstrong*, 517 U.S. 456, 463, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)). Judgment should be entered in favor of the City on the selective enforcement claim.

### C. The Emergency Curfew Orders were a proper exercise of both police powers and local authority under the Home Rule Amendment to the Ohio Constitution.

A municipality's authority to exercise police powers are co-equal to the state because of the Home Rule Amendment. The state cannot unilaterally invalidate local laws, as Plaintiffs seem to suggest. *Cleveland v. State*, 138 Ohio St.3d 232 (2014). To conclude that a municipality has exceeded its authority under the Home Rule Amendment, the court must determine that the regulations conflict, the municipal regulation is an exercise of police power (not local self-government) and the state regulation is a general law. *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005 (emphasis added).

In this case, Plaintiffs present no response on the first two elements, which is fatal to their argument. *See Cleveland v. State*, 2013-Ohio-1186, 989 N.E.2d 1072 (8th Dist.) (citing *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005). Nor is Plaintiffs' conclusory analysis of whether the State of Ohio's orders related to COVID-19 are general laws complete or accurate. Plaintiffs ignore the statutory framework under the Ohio Revised Code that authorizes power sharing in this area. *See* Ohio Rev. Code § 3707.04. Plaintiffs also fail to point to any evidence of an intent to exclude any local regulation in this area by the State of Ohio. Plaintiffs' theory that the Emergency Curfew Orders are invalid under Ohio's Constitution is not plausible and should be dismissed.

**D. Plaintiffs abandoned their Open Meetings Act claim.**

Plaintiffs make no argument defending their alleged Open Meeting Act violation under Ohio law. Accordingly, the Court should treat that claim as abandoned. *See Dage v. Time Warner Cable*, 395 F.Supp.2d 668, 679 (S.D. Ohio 2005) (plaintiff abandoned claim by failing to address it in responsive briefing); *Bolden v. Village of Lincoln Hts.*, S.D.Ohio No. 1:12cv41, 2013 U.S. Dist. LEXIS 141290, at *8 (Sep. 29, 2013).

**E. The Emergency Curfew Orders were a valid exercise of authority by the Mayor.**

The basic responsibility of government is to protect people and their property from harm. That role is no more apparent than during a crisis when government needs to respond in the moment to ensure the safety of the public. Nothing is more fundamental. The Charter, Council legislation, and the Cincinnati Administrative Code (C.A.C) establish respective functions of the Mayor and City Council that have been undisputed for decades The issue raised by Plaintiff to the process where the Emergency Curfew Orders were implemented is the result of selective reading of certain passages of the Charter. There is no question the Mayor has the authority to declare a state of emergency and implement a curfew.

**1. The Charter states that the Mayor has authority to declare a state of emergency.**

At the heart of Plaintiff's contentions about separation of powers is a misunderstanding regarding the difference between legislative and executive roles under the Charter. Article III of the Charter of the City of Cincinnati authorizes the Mayor, with the consent of Council, to "take command of the police, maintain order and enforce the law" during a time of "public danger or emergency." Charter Art. III, Section 2. However, Plaintiffs point to Article II of the Charter to argue that the "declaration of an emergency" is to be made by Council. Charter, Art. II, Sec. 3. What Plaintiffs fail to appreciate is that the emergency referred to in Article II, Section 3 refers

to ordinances which are legislation. A reading of the entire section makes the context readily apparent:

> Emergency ordinances upon a yay and nay vote must receive the vote of a majority of the members elected to the council, and the declaration of an emergency and the reasons for the necessity of declaring said ordinances to be emergency measures shall be set forth in one section of the ordinance, which section shall be passed only upon a yay and nay vote of two-thirds of the members elected to the council upon a separate roll call thereon.

The emergency section of an ordinance allows a legislative action of Council to take immediate effect without being subject to referendum. However, the declaration of a state of emergency is not an ordinance.[8] An ordinance is "a law, statute, or legislative enactment, particularly the legislative enactments or statutes of a municipal corporation." The Law Dictionary (2020). The Charter provides that Council and the Mayor can engage in a number of official actions that are not ordinances such as resolution and motions. Plaintiffs conflate these distinctly different official actions. But the declaration of a state of emergency is an executive action. It appears within the Charter under the article of the Mayor's powers. Article II Section 3 is inapplicable because an emergency declaration has no emergency clause. The emergency IS the declaration. In short, the only similarity between an emergency clause and an emergency declaration is the word "emergency." They are entirely separate concepts under the Charter.[9]

---

[8] The Florida case cited by Plaintiffs does not command a different result. *Mun. Court, Fort Lauderdale v. Patrick*, 254 So.2d 193, 194 (Fla.1971). In *Patrick*, the Mayor implemented a curfew proclamation with penalties during a mass riot where part of the city was burned down. The court held that the municipal charter and Florida law required the imposition of "violations and penalties" must be by legislative action. However, the court did not indicate that the declared state of emergency was invalid. The application of *Patrick* to the present facts would result in upholding the Emergency Curfew Orders. Like in *Patrick*, the Mayor declared an emergency. But in contrast to what occurred in *Patrick*, Cincinnati City Council did act legislatively to permit the issuance of a curfew and a penalty through the Cincinnati Administrative Code.

[9] Moreover, even if the Charter did not explicitly define which body might declare an emergency, Council has enacted legislation to make clear that it is the role of the Mayor to do so. C.A.C. Art. XVIII, Sec. 5. While Plaintiffs contend such action by Council is an impermissible delegation of authority, they does not distinguish or analyze the issue in light of the Ohio Supreme Court's holding in *Matz v. J. L. Curtis Cartage Co.,* where the Court held that legislative delegation of power without standards is permissible "for the protection of the public morals, health, safety or general welfare." *Matz v. J. L. Curtis Cartage Co.*, 132 Ohio St. 271, 272, 7 N.E.2d 220 (1937).

### 2. Council's consent to an emergency declaration does not require an affirmative vote by its members.

Even if the Mayor's declaration of a state of emergency was defective, Council consented to the state of emergency that was in effect when the Emergency Curfew Orders were issued by the Mayor. On March 11, 2020, the Mayor declared the first COVID-19 state of emergency in the City of Cincinnati. (Ex. 1, March 11, 2020 Minutes of Cincinnati City Council). Filed with Council as a "Statement," the Mayor's declaration of emergency was assigned Council No. 202000444 and appeared on Council's March 11, 2020 Calendar where its status is listed as "Consented & Filed." One week later, the Mayor's Statement appeared again on Council's March 18, 2020 Calendar where its status is again listed as "Consented & Filed." (Ex. 2, March 18, 2020 Minutes of Cincinnati City Council).

Just two days later on March 20, 2020, Council met for a special session. Via a unanimous yea vote, Council passed Item No. 202000483, Ordinance No. 0096-2020 which amended C.A.C. Article XVIII, Section 9 to extend the period by which an emergency may exist without any further action of Council from two weeks to sixty days. The third "whereas" clause of that ordinance crucially recognizes that the COVID-19 pandemic could potentially "create an environment where it is impossible for Council to meet and extend the emergency declaration that is needed to address the public danger or emergency." *Id*. That same day, the Mayor issued another declaration of emergency, now with a sixty day prospective duration, also filed as a Statement with Council, Item No. 202000487, which appears on the March 20, 2020 Council Calendar with the status of "Consented & Filed." That same Statement would appear on an additional three separate Council Calendars, and each time with the same status of "Consented & Filed": April 1, 2020, April 15, 2020, and April 29, 2020. Consequently, when the Emergency

16

Curfew Orders were enacted, it was within 60 days of Council's consent which was last given on April 29, 2020. (Ex. 3, April 29, 2020 Minutes of Cincinnati City Council).

Nowhere in the Charter, Rules of Council or C.A.C. is Council required to vote to register its consent. Plaintiffs fail to cite to anything for this conclusion aside from the assertion in their response that it is the "custom" of Council. (Doc. 21 at 23). Notably, this allegation is absent from the pleadings. Regardless, Article II, Section 5 of the Charter provides that "all legislation enacted by the council shall be by ordinance except where otherwise required by the constitution or laws of the state of Ohio" and "on the passage of legislation the vote shall be taken by yeas and nays and entered upon the journal." In other words, only municipal ordinances explicitly require an affirmative up or down vote by Council. Other legislative items can be disposed of at Council's discretion. And indeed, individual Councilmembers can obtain a vote on particular items where Council's consent is required. For example, Rule 6.6 of the Rules of Council permits a member to change his or her vote with "the consent of the members," but "[i]f a Member objects, permission shall be granted by a majority vote." (Ex. 4, Rules of Cincinnati City Council). In short, the practice of Council when their consent is required is to vote only when there is an objection. In this case, there was no evidence of any objection to the emergency declaration.

### 3. The Emergency Curfew Orders relate to the state of emergency declared for unrest and the pandemic.

Plaintiffs are correct that the Mayor's powers during a state of emergency are not absolute. As the City stated in its motion for judgment on the pleadings, authority during a time of emergency is limited both by constitutional protections of individual rights. In addition, during a state of emergency, the Mayor's powers are further defined by ordinance in the C.A.C. However, it is incumbent on Plaintiffs to identify how the exercise of those powers exceeds a

17

specific constitutional or statutory provision. Plaintiffs have not pointed to any that would support their contention that the Mayor lacks authority to order a curfew during an emergency, whether related to a pandemic or civil unrest. Indeed, Section 7 of Title XVIII of the C.A.C. directly contradicts Plaintiffs' position. It explicitly states when there is a state of emergency, the Mayor may enact a curfew. C.A.C. Art. XVIII, Sec. 7(d). Plaintiffs' claim seems to be that implicit in each state of emergency are limitations on executive authority that are not defined either by the declaration of emergency itself, ordinance, or any other defined body of law. For this bizarre contention, Plaintiffs provide no authority.

Regardless, there was a connection between the public health and safety concerns raised by the pandemic and mass civil unrest. The response to large, disorderly crowds necessitated concentration of law enforcement officers in confined areas, leading to the possibility of uncontrolled transmission of COVID-19 through the City's entire law enforcement apparatus as well as to the demonstrators. (Doc. 10 ¶ 12). The conditions before the curfew made it difficult, if not impossible, for officers observe social distancing or wear masks. In the volatile situation the officers were in, masks impose a hazard by obstructing vision or communication. With mandatory quarantines of exposed individuals, there was the real potential that the public safety might have been crippled by illness for weeks, leaving the entire City in a crisis. Each day that passed where officers had to be in confined and close proximity waiting to respond, conditions that are ideal for spread of COVID-19, the risk increased exponentially. Moreover, as previously noted, Plaintiffs fail to acknowledge that the State of Ohio has implemented curfew orders in the last several months to combat the pandemic that largely mirrored the curfew implemented by the City.

18

Simply stated, Plaintiffs disagree that there is a link between both crises. But disagreeing with a public official is not a cause of action. Plaintiffs must identify a right that has been abridged or that the authority to enact a law was exceeded. While Plaintiffs have made First and Fourteenth Amendment challenges in their pleadings and briefing, neither pertains to the authority of the Mayor to implement a curfew curing an emergency, which is explicitly authorized under the Cincinnati Administrative Code.

## CONCLUSION

For the reasons stated, the City's motion for judgment on the pleadings should be granted.

Respectfully submitted,

**ANDREW W. GARTH (0088905)**
City Solicitor

*/s/ Mark R. Manning*
Emily Smart Woerner (0089349)
Mark R. Manning (0088331)
City Solicitor's Office
City Hall, Room 214
801 Plum Street
Cincinnati, Ohio 45202
(513) 352-4576
Fax: (513)352-1515
Mark.manning@cincinnati-oh.gov
*Counsel for Defendant City of Cincinnati*

**CERTIFICATE OF SERVICE**

      I certify that a true and accurate copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed to those parties listed below who are not served via the Court's electronic filing system. Parties may access this filing through the Court's system.

                                            */s/ Mark R. Manning*
                                            Mark R. Manning (0088331)